AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| United States of America<br>v.<br>**Esther Andrade Olson**<br><br>*Defendant(s)* | )<br>)<br>) Case No. 5:23-mj-00017-CDB<br>)<br>)<br>)<br>) |

**FILED**
May 18, 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **July 5, 2022, to August 30, 2022,** in the county of **Tulare** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 657 | Embezzlement by credit union employee |

This criminal complaint is based on these facts:

See attached affidavit, which is incorporated by reference as though fully set forth herein.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Cori Orr, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone and e-mail.

Date: May 18, 2023

_____
*Judge's signature*

City and state: Bakersfield, California    Hon. Christopher D. Baker, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Cori Orr, being duly sworn, depose and state as follows:

### I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2022. I am a graduate of the FBI's Basic Field Training Program in Quantico, Virginia, and I have been involved in several investigations regarding violations of federal law, including financial fraud. I am currently assigned to the FBI's Fresno Resident Agency, where I am a member of the white-collar crime squad. Prior to joining the FBI, I spent two and a half years as an auditor at a public accounting firm.

2. This Affidavit is made in support of a federal criminal complaint and arrest warrant for ESTHER ANDRADE OLSON, who is an assistant branch manager at CREDIT UNION ONE, for embezzling over $60,000 from the credit union in violation of 18 U.S.C § 657. The Affidavit is based on my training and experience as well as my personal knowledge and communications with other law enforcement investigators and witnesses in this case. This Affidavit is intended to show that there is probable cause for the complaint. It does not set forth all of my knowledge about the case.

### II. APPLICABLE LAW

3. Under 18 U.S.C § 657, an employee who knowingly and willfully, and with the intent to defraud, embezzles more than $1,000 that is in the care, custody, or control of a credit union, whose accounts are insured by the National Credit Union Administration Board ("NCUA"), shall be imprisoned up to 30 years, fined up to $1,000,000, or both.

### III. SUMMARY OF PROBABLE CAUSE

4. From July 5, 2022, through August 30, 2022, ESTHER ANDRADE OLSON was an assistant branch manager at a CREDIT UNION ONE branch in Tulare County, State and Eastern District of California, whose accounts were insured by the NCUA. During this period, she made over $60,000 in unauthorized cash withdrawals from victims' accounts at the credit union. The evidence includes the victims' confirming that the withdrawals were fraudulent, surveillance video of OLSON making the withdrawals, OLSON acknowledging that she made the withdrawals but falsely stating in emails that the victims had approved them, and OLSON telling a colleague "I'm done" and abruptly

resigning from her job after learning that CREDIT UNION ONE was conducting an internal investigation. Therefore, I request that the Court issue a federal complaint and arrest warrant for OLSON for embezzling money from a credit union in violation 18 U.S.C. § 657.

### IV.   STATEMENT OF PROBABLE CAUSE

**A. CREDIT UNION ONE's relevant policies and procedures, and internal investigation into OLSON**

6.   In November 2022, CREDIT UNION ONE contacted the FBI to report theft committed by its former assistant branch manager, ESTHER ANDRADE OLSON, from June 2022 through August 2022, at its branch in Tulare County, State and Eastern District of California. On November 21, 2022, I interviewed K.C., who is CREDIT UNION ONE's internal audit director, and D.A., who is CREDIT UNION ONE's senior vice president of risk management. K.C. and D.A. provided me with the findings from CREDIT UNION ONE's internal investigation into OLSON. They also discussed relevant policies, procedures, and job descriptions at CREDIT UNION ONE as follows:

7.   When a CREDIT UNION ONE member enters a branch and wants to withdraw cash, the member must go to a teller window and be identified by the employee. Per CREDIT UNION ONE's policies and procedures, employees are required to identify the member making the transaction. Employees can request identification from the member or identify the member by sight based on prior interactions if they know the member well enough. The most common method is the presentation of a driver's license by the member. Identification methods are documented by the employee on the e-Receipt that is generated for the transaction. Only after the member is identified can the cash withdrawal be made.

8.   At CREDIT UNION ONE, employees have a few methods of getting the cash for cash withdrawals requested by members. First, employees can get the cash from the Teller Cash Recycler ("TCR"). A TCR is a common machine that banks and credit unions use to process cash transactions for the employees from the cash inventory. Second, employees can get the cash from their assigned teller drawers (aka, "cash cans"). Employees can have different dollar limits for their cash cans. For example, certain employees might have a $10,000 limit while a manager might have a $20,000 limit. Finally, employees can get the cash by accessing the locked vault. On any given day, one employee is

assigned to be the vault teller. This allows the employee to access the vault, which has up to $200,000 in cash. The branch manager or assistant branch manager is usually the vault teller.

9. Once the cash withdrawal is completed, an e-Receipt is generated and a handwritten signature from the member is required on the receipt.

10. All transactions made at CREDIT UNION ONE are electronically recorded in journals, which are known as the Teller Chron Journals. The Teller Chron Journals list all transactions for a specific employee, on a specific day, in chronological order, with a unique number for each transaction. The Teller Chron Journals are processed through CREDIT UNION ONE's central computer system, which is known as DataSafe.

11. Each employee is assigned a unique teller identification number ("Teller ID") and password that allows him or her to log-in to the Teller Chron Journals and DataSafe. Importantly, passwords are confidential, and employees are prohibited from sharing their passwords unless they are training a new employee and the new employee has not yet been assigned a password. In that situation, the employee can share his or her password with the new employee so long as the employee is present and approves any transactions made by the new employee. K.C. told me that password sharing rarely happens at CREDIT UNION ONE.

12. CREDIT UNION ONE produced a floor plan of its Tulare branch that showed the places where employees could sit and work. There were three areas where OLSON primarily sat and did work as the assistant branch manager. The first place was at the teller windows. The second place was at a cubical desk. The third place was at the operations desk directly behind the teller windows. Based on my review of surveillance video, employees can be seen at the teller windows and cubical desks helping members from a high angle. But there is no surveillance video of employees when they leave the areas to get cash for cash withdrawals. They can just be seen leaving and then returning with the cash in hand. And there is no surveillance video of employees at the operations desk according to K.C.

13. K.C. told me that there are times when after-hours transactions may be necessary by employees to close out the business day. These transactions, however, are limited to non-cash transactions. Therefore, no one should be making cash transactions after-hours.

### B. CREDIT UNION ONE commences internal investigation into OLSON

14. On September 26, 2022, a joint account holder related to VICTIM ONE contacted CREDIT UNION ONE's Tulare branch and asked about several, recent unauthorized cash withdrawals on VICTIM ONE's accounts totaling over $35,000. The matter was referred to the branch manager and the internal audit department for an internal investigation. During the internal investigation, three additional victims were identified. CREDIT UNION ONE subsequently produced related records to the FBI in response to a subpoena.

15. Employment records produced by CREDIT UNION ONE showed that OLSON began working at the credit union in 2005 and that she was promoted to assistant branch manager at the Tulare branch in 2019.

### C. OLSON stole over $35,000 from VICTIM ONE's accounts

16. Teller Chron Journals produced by CREDIT UNION ONE showed that, between August 3, 2022, and August 30, 2022, seven cash withdrawals totaling over $35,000 were made by OLSON's Teller ID from VICTIM ONE's savings and checking accounts. Surveillance video produced by CREDIT UNION ONE showed that OLSON made the withdrawals at the teller window. I determined that it was OLSON on the surveillance video by reviewing OLSON's photographs that were on file with the California Department of Motor Vehicles and asking K.C., who had worked with OLSON for years, to confirm that it was her. The surveillance video also showed that another CREDIT UNION ONE member, who was not VICTIM ONE or VICTIM ONE's joint accountholders, was present for the transactions. For reference, CREDIT UNION ONE maintained copies of VICTIM ONE and VICTIM ONE's joint-account holders' driver's licenses in its files. The driver's licenses were compared to surveillance video taken at the time of the withdrawals, and neither VICTIM ONE nor VICTIM ONE's joint accountholders were seen.

17. Signatures were not obtained on the e-Receipts for any of the withdrawals as required.

18. VICTIM ONE and VICTIM ONE's joint-account holders subsequently confirmed in a written statement submitted to CREDIT UNION ONE that the withdrawals were unauthorized.

19. K.C. told me that OLSON had assisted VICTIM ONE and VICTIM ONE's joint-account holders several times in the past based on the Teller Chron Journals and surveillance video, and

4

therefore OLSON had access to VICTIM ONE's account information. I reviewed the Teller Chron Journals and surveillance video, and confirmed K.C.'s statement

20. Further analysis of the Teller Chron Journals and surveillance video showed that several other unauthorized cash withdrawals were made on other members' accounts by OLSON's Teller ID in the same fashion as VICTIM ONE.

**D. OLSON stole over $18,000 from VICTIM TWO's account**

21. Teller Chron Journals produced by CREDIT UNION ONE showed that, from July 5, 2022, through August 5, 2022, over $18,000 in cash withdrawals were made by OLSON's Teller ID from VICTIM TWO's checking account. Surveillance video produced by CREDIT UNION ONE showed that OLSON made the withdrawals at the teller window. The surveillance video also showed that another CREDIT UNION ONE member, who was not VICTIM TWO, was present for the transactions. For reference, CREDIT UNION ONE maintained a copy of VICTIM TWO's driver's license in its files. The driver's license was compared to surveillance video taken at the time of the withdrawals, and VICTIM TWO was not seen.

22. Again, signatures were not obtained on the e-Receipts for any of the withdrawals as was required.

23. K.C. subsequently interviewed VICTIM TWO and VICTIM TWO confirmed that the withdrawals were unauthorized.

24. K.C. told me that OLSON had assisted VICTIM TWO several times in the past based on the Teller Chron Journals and surveillance video, and therefore OLSON had access to VICTIM TWO's account information. I reviewed the Teller Chron Journals and surveillance video, and confirmed K.C.'s statement.

25. Additionally, on July 19, 2022, CREDIT UNION ONE's accounting department was told about an incident where the daily cash totals for the Tulare branch were not balancing and were short by $5,000. The incident occurred a few days earlier on July 15, 2022, when a $5,000 cash withdrawal was made by OLSON's Teller ID from VICTIM TWO's savings account. OLSON's Teller ID then performed several transactions from her cash can and the vault to replenish the money, and a "Request for Correction" email was sent from OLSON's assigned CREDIT UNION ONE email account to the

5

accounting department. In the email, OLSON said, "I was looking at this account and the money should have been credited back to the member's account not debited."

### E. OLSON stole over $7,000 from VICTIM THREE's account

26. Teller Chron Journals produced by CREDIT UNION ONE showed that, from August 5, 2022, through August 30, 2022, $7,500 in cash withdrawals were made by OLSON's Teller ID from VICTIM THREE's savings account.

27. Surveillance video produced by CREDIT UNION ONE showed that OLSON made the withdrawals at the teller window. The surveillance video also showed that another CREDIT UNION ONE member, who was not VICTIM THREE, was present for the transactions. For reference, CREDIT UNION ONE maintained a copy of VICTIM THREE's driver's license in its files. The driver's license was compared to surveillance taken at the time of the withdrawals, and VICTIM THREE was not seen.

28. Again, signatures were not obtained on the e-Receipts for any of the withdrawals as was required.

29. K.C. subsequently interviewed VICTIM THREE and VICTIM THREE confirmed that the withdrawals were unauthorized.

30. K.C. told me that OLSON had assisted VICTIM THREE several times in the past based on the Teller Chron Journals and surveillance video, and therefore OLSON had access to VICTIM THREE's account information. I reviewed the Teller Chron Journals and surveillance video, and confirmed K.C.'s statement.

31. K.C. told me CREDIT UNION ONE's internal investigation found that, for VICTIMS ONE through THREE, OLSON made the unauthorized cash withdrawals by bringing up the victims' accounts while she was assisting other members who were physically in front of her at the teller window and were also making cash withdrawals. Based on my training and experience, I believe that OLSON was making it appear as though she had legitimate reasons to access CREDIT UNION ONE's cash stores so as to conceal her misconduct from others.

### F. OLSON stole from VICTIM FOUR's account after-hours

32. Teller Chron Journals produced by CREDIT UNION ONE showed that, on August 5, 2022, an $80 cash withdrawal was made by OLSON's Teller ID from VICTIM FOUR's savings account

1  after business hours when the branch was closed.  Review of the Teller Chron Journal showed that
2  Olson performed this transaction from the operations desk, which does not have a surveillance camera .

3      33.    Again, a signature was not obtained on the e-Receipt for the withdrawal as was required.

4      34.    K.C. subsequently interviewed VICTIM FOUR and VICTIM FOUR confirmed that the
5  withdrawal was unauthorized.

6      **G. OLSON's theft is corroborated by her emails, contemporaneous statements, and abrupt**
7          **resignation after learning about the investigation**

8      35.    On September 15, 2022, Olson was contacted by the CREDIT UNION ONE's risk
9  management team, through her assigned CREDIT UNION ONE email account, about the lack of
10 signatures on several e-Receipts for cash withdrawals that she made for VICTIM TWO.  The risk
11 management team also asked her why VICTIM TWO was withdrawing the cash.  OLSON replied by
12 email saying, "She [VICTIM TWO] mentioned to me that she was doing some remodeling.  I apologize
13 I always get signatures on my receipts.  I don't know why it doesn't have any signatures. . ."

14     36.    K.C. subsequently interviewed different CREDIT UNION ONE employees who worked
15 with OLSON.  One employee recalled a conversation with OLSON the day OLSON was contacted by
16 the risk management team where OLSON said, "I know how this goes.  I'm done."  Several other
17 employees said that OLSON appeared to be checked out from her job of late and that she spent a lot of
18 time on her personal cell phone, in the break room, or in the bathroom.

19     37.    The day after OLSON was contacted by the risk management team, she quit her job at
20 CREDIT UNION ONE without giving any prior notice.

21     38.    On April 21, 2023, I received employment records for OLSON from the Employment
22 Development Department for the State of California for the fourth quarter of 2022.  The records showed
23 that she started working at another financial institution after quitting her job at CREDIT UNION ONE.

24     **H. OLSON's theft is further corroborated by her own banking records and social media**

25     39.    Bank account records for OLSON produced by CREDIT UNION ONE and BANK ONE
26 in response to subpoenas showed that she had accounts at these institutions and that she was the only
27 signatory on the accounts.  The bank account records also showed that she did not make any cash
28 deposits into these accounts from January through April 2022.  Then, from May through December

2022, she deposited over $25,000 in cash. This increase in cash deposits corresponds with the period when OLSON was stealing the cash from victims' accounts at CREDIT UNION ONE.

40. Moreover, bank account records for OLSON produced by CREDIT UNION ONE and BANK ONE showed that, from April through December 2022, she spent over $60,000 on TikTok.com. Based on my own online research and discussions with TikTok representatives, TikTok is an online, social media application that allows users to create and publish mobile videos. Users can also follow each other and send each other TikTok coins. They do so to support one another and promote themselves on the application. Coins are purchased with actual money by users before being sent to the recipients. Once the recipients receive a certain amount of coins, they can convert the coins into virtual credits called diamonds that can then be withdrawn by the recipients in exchange for actual money that is deposited into their bank accounts.

41. TikTok records produced in response to a subpoena confirmed that OLSON had a TikTok account with thousands of followers.

42. OLSON's coworkers at CREDIT UNION ONE also said in interviews that OLSON had recently dated a man in Texas who she met on TikTok who had hundreds of thousands of followers himself. Bank account records for OLSON produced by CREDIT UNION ONE and BANK ONE showed that she sent this man thousands of dollars and visited Texas on several occasions, again, while she was stealing the cash from victims' accounts at CREDIT UNION ONE.

43. Therefore, I believe that OLSON stole the cash from victims' accounts at CREDIT UNION ONE to, at least in part, support others and promote herself on TikTok, and to send money to her boyfriend in Texas.

44. On May 16, 2023, I used the NCUA's online tool to search for CREDIT UNION ONE. This tool allows anyone to search for credit unions in the United States and confirm that the credit unions' accounts were NCUA-insured. I confirmed that CREDIT UNION ONE's accounts were so insured at all relevant times.

///

///

///

## V. CONCLUSION

45. I submit that the above-referenced facts establish probable cause to believe ESTHER ANDRADE OLSON violated 18 U.S.C. § 657. Therefore, I request that the Court issue a federal complaint and arrest warrant for her.

Respectfully submitted:

_____
Cori Orr
FBI Special Agent

Approved as to form:

*/s/ Chan Hee Chu*
Chan Hee Chu
Special Assistant U.S. Attorney

Affidavit submitted by email and pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4(d) and 4.1 before me this ___18th___ day of May 2023:

_____
Honorable Christopher D. Baker
United States Magistrate Judge